# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

Evanngelynn Sharonette Dew,

      Plaintiff,

v.

Commissioner of Social Security,

      Defendant.

Civ. No. 09-1986 (JMR/JJK)

**REPORT AND
RECOMMENDATION**

---

Wesley T. Graham, Esq., and Joseph T. Dixon, Jr., Esq., Henson & Efron,
counsel for Plaintiff.

Lonnie F. Bryan, Esq., Assistant United States Attorney, counsel for Defendant.

---

JEFFREY J. KEYES, United States Magistrate Judge

## INTRODUCTION

Pursuant to 42 U.S.C. § 405(g), Plaintiff Evanngelynn Sharonette Dew

seeks judicial review of the final decision of the Commissioner of Social Security

("the Commissioner"), who denied Plaintiff's applications for disability-insurance

benefits and supplemental-security income. The parties have filed cross-motions

for summary judgment. (Doc. Nos. 12, 15.) This matter has been referred to the

undersigned for a Report and Recommendation pursuant to 28 U.S.C. § 636 and

District of Minnesota Local Rule 72.1. For the reasons stated below, this Court

recommends that Plaintiff's motion be denied and that Defendant's motion be

granted.

This is one of many difficult disability-insurance-benefits cases in which a claimant who suffers from a long history of drug addiction and alcohol abuse, as well as multiple other physical and mental difficulties, is denied coverage because the drug and alcohol abuse is a "contributing factor material to [her] disab[ility]." 42 U.S.C. § 423(d)(2)(C) . This arises from the fact that in 1996 Congress set new standards of eligibility for claimants who fell into the "DA&A" category, that is "Drug Users and Alcoholics." Members of Congress believed that payments of benefits to addicts "inappropriately divert scarce federal resources from severely disabled individuals" and "provide a perverse incentive, contrary to the long-term interest of addicts and alcoholics, by providing them with cash payments so long as they do not work." Interim Report by the Lewin Group, Inc., Policy Evaluation of the Effect of Legislation Prohibiting the Payment of Disability Benefits to Individuals Whose Disability is Based on Drug Addiction and Alcoholism, at I-3 (April 28, 1998) (citing Senate Comm. on Finance, Report on the Family Self-Sufficiency Act Of 1995, 104-96 (1995)). As a result, Congress sought to remove the "perverse incentives" by enacting the Contract with America Advancement Act of 1996, Pub. L. No. 104-121, which eliminated Medicare/Medicaid coverage for those whose drug or alcohol addiction was such a contributing factor material to their disability.

Essentially, the standard for eligibility since 1996 asks whether the claimant would still be disabled, due to other impairments, if he or she stopped consuming drugs or alcohol. In practice, this standard functions as a "but for"

test: if the applicant's disability would exist but for continuing substance abuse, then the claim is denied. This presents claim adjudicators with the extremely difficult task of sorting out, often in a highly speculative endeavor, the relationship between the claimant's addiction and the claimant's often many other intertwined disorders such as depression, bi-polar disorder, anxiety, schizoid behavior, and physical ailments. And it often places a virtually insurmountable burden on the claimant who bears the burden of proving that her DA&A is not a contributing factor to the disability. *See Middlestedt v. Apfel*, 204 F.3d 847 (8th Cir. 2000) (holding that a claimant with a heart condition and seizures who failed to show that alcohol was not a material factor, thus, was not disabled).

Plaintiff in this case presents just such a compelling, indeed heartbreaking, history of a life marked by polysubstance abuse, depression, bipolar disorder, affective disorder, antisocial personality disorder, intermittent explosive disorder, among other medical complications, and periods of homelessness. One cannot read her medical history and not come away stunned by what she has been through. But Congress has prohibited the payment of benefits to individuals who would not be disabled if they were to cease abusing drugs and alcohol, and this Court's review here is limited to whether there is substantial evidence to support the agency's decision denying Plaintiff's claim on this basis, not whether this Court would have made the same decision on this record. And here, as explained in detail below, there was competent medical evidence that if Plaintiff stopped abusing drugs and alcohol she would have the residual functional

capacity to work at available jobs.  Thus, this Court must recommend that Defendant's motion be granted and Plaintiff's motion be denied.

## BACKGROUND

### I.    Procedural History

Plaintiff filed a prior application for disability-insurance benefits and supplemental-security income in November 2003.  (Tr. 114-16.)[1]  On September 10, 2007, an Administrative Law Judge ("ALJ") denied Plaintiff's claim, finding that she was not disabled within the meaning of the Social Security Act at any time from the alleged onset date of October 31, 2003, through the date of the decision.  (Tr. 33-46.)  The Appeals Council denied review.  (Tr. 27-29.)  Plaintiff did not seek judicial review of that decision; therefore, it was a final decision. (*See* Doc. No. 16, Def.'s Mem. in Supp. of Mot. for Summ. J. ("Def.'s Mem.") 2.) Evidence in the record relating to this prior application bears on certain issues regarding the grounds for the denial of Plaintiff's present application.

Plaintiff filed her present application for disability-insurance benefits and supplemental-security income on October 11, 2007, alleging a disability onset date of September 11, 2007, one day after the ALJ's denial of her prior claim. (Tr. 824-30.)  The application was denied initially and on reconsideration. (Tr. 760-62, 783-89.)  Plaintiff timely requested a hearing, which was held before

---

[1]     Throughout this Report and Recommendation, this Court refers to the administrative record (Doc. No. 11), for the present case, Civ. No. 09-1986, by the abbreviation "Tr."

an ALJ on October 23, 2008.  (Tr. 781-82, 1158-71.)  On February 17, 2009, the

ALJ issued an unfavorable decision.  (Tr. 14-26.)  Plaintiff sought review of the

ALJ's decision, but the Appeals Council denied her request for review on May 29,

2009.  (Tr. 9-11.)  The ALJ's decision therefore became the final decision of the

Commissioner.  *See* 20 C.F.R. §§ 404.981, 416.1481.  On July 30, 2009, Plaintiff

filed the instant action with this Court, seeking judicial review pursuant to 42

U.S.C. §§ 405(g) and 1383(c)(3).  The parties thereafter filed cross-motions for

summary judgment.  *See* D. Minn. Loc. R. 7.2.

## II.    Factual Background and Medical History

Plaintiff was born on May 20, 1967.  (Tr. 824.)  At the time of her alleged

onset of disability, September 11, 2007, she was 40 years old.  (Tr. 21.)  She

earned a general equivalency diploma in 1981.  (Tr. 860.)  She has past relevant

work as a cook.  (Tr. 847-53.)  Plaintiff alleged that the following conditions limit

her ability to work: asthma, mood disorder, depression, carpal-tunnel syndrome,

and an achilles-tendon injury.  (Tr. 855.)  In a Disability Report, Plaintiff admitted

that she had a problem with drugs and alcohol, but stated that was not the basis

for her other conditions.  (Tr. 217.)  This Court will review the medical records

divided into categories of physical impairments, substance-abuse treatment, and

other mental-health impairments, before and after the alleged onset date.

**A.    Medical Records of Physical Impairments Before September 11, 2007**

Many of the medical records of Plaintiff's treatment for physical impairments are dated prior to the alleged onset date of September 11, 2007.[2] Plaintiff has been treated for asthma exacerbations at various hospitals, twice in 2001, seven times in 2002, three times in 2003, three times in 2004, four times in 2005, seven times in 2006, and four times in 2007.[3]  Plaintiff was also occasionally treated for other physical illnesses or injuries prior to her September 11, 2007 alleged onset date.  The first instance in the record was on August 5, 2003, when Plaintiff went to Roseland Community Hospital and complained of

---

[2]    Evidence before the onset date can be relevant because, "[t]he ALJ should consider medical evidence in light of the medical presumptions that reasonably can be made about the course of the condition."  *Davis v. Astrue*, No. C06-4106-PAZ, 2008 WL 130778, at *3 (N.D. Iowa Jan. 15, 2008).

[3]    Plaintiff's hospital admissions and/or emergency room treatment for asthma occurred on the following dates: September 24, 2001 (Tr. 540-47); December 21, 2001 (Tr. 307-17); March 24, 2002 (Tr. 285-92); April 22, 2002 (Tr. 518-39); May 19, 2002 (Tr. 261-67, 282-83, 517); May 27, 2002  (Tr. 385-86); June 12, 2002 (Tr. 253-60); August 1, 2002 (Tr. 376-77); September 11, 2002 (Tr. 374-75); February 15, 2003 (Tr. 219-28); July 8, 2003 (Tr. 297-99); August 26, 2003 (294-96); January 13, 2004 (570-71); August 9, 2004 (Tr. 352); October 9, 2004 (Tr. 414-39); March 29, 2005 (Tr. 575-97, 668-81); April 25, 2005 (Tr. 456-77); August 29, 2005  (Tr. 478-88); November 9, 2005 (Tr. 491-516, 636-39); February 24, 2006 (Tr. 657-64); May 14, 2006 (Tr. 609, 641-55); June 13, 2006  (Tr. 600-02); June 29, 2006 (Tr. 627-32, 718); August 2, 2006 (Tr. 717); September 1, 2006 (Tr. 610-21); October 18, 2006 (Tr. 700-13); January 2, 2007 (Tr. 693-98); January 6, 2007 (Tr. 622-26, 716); January 30, 2007 (Tr. 719); February 2, 2007 (Tr. 633-35, 715); July 9, 2007 (Tr. 752.)

dizziness and her eyes rolling in the back of her head.  (Tr. 234.)  She was

diagnosed with mild hypoglycemia and drug abuse.  (Tr. 235-36.)

On September 20, 2003, Plaintiff went to the Saint Margaret Mercy

emergency room complaining of hand pain and ankle swelling.  (Tr. 246-47.)

Plaintiff was prescribed Motrin and discharged.  (Tr. 249-50.)  On October 2,

2003, Plaintiff was again treated for bilateral hand pain at John J. Stroger, Jr.,

Hospital.  (Tr. 361-68.)  She was prescribed Tylenol.  (Tr. 366.)

Several months later, Plaintiff was in a motor-vehicle accident and had X-

Rays of her chest and left femur at South Shore Hospital.  (Tr. 301-06.)  Both X-

Rays were negative.  (Tr. 305-06.)  Later that week, preliminary EMG results

indicated that Plaintiff had bilateral median mono neuropathy of the wrists,

severe on the left and moderate to severe on the right.  (Tr. 441.)  On January

13, 2004, Plaintiff went to the emergency room at St. Margaret Mercy Healthcare

Centers in Hammond, Indiana, for treatment of asthma, and knee and arm pain.

(Tr. 567-71.)  She was diagnosed with acute exacerbation of asthma, tinea pedis

(commonly known as athlete's foot), and a knee contusion.  (Tr. 570-71.)  An X-

Ray of her knee showed no fracture, dislocation, or bone abnormalities.  (Tr.

565.)

### B. Medical Records of Substance Abuse Treatment Before September 11, 2007

Plaintiff was admitted to the Women's Treatment Center in Chicago,

Illinois, for detoxification on August 8, 2002.  (Tr. 399-400.)  It was noted that

Plaintiff had a diagnosis of major depression with anger control problems and memory loss related to drug usage.  (Tr. 400.)  She was also noted to have poor impulse control, as evidenced by numerous arrests over a fifteen-year period.  (*Id.*)  It was Plaintiff's third treatment episode.  (*Id.*)  On September 23, 2002, Plaintiff completed forty-five days of treatment.  (Tr. 406).  Plaintiff also had two more admissions to The Women's Treatment Center, from June 6 through June 13, 2003, and from September 9 through September 16, 2004.  (Tr. 394, 388-92, 397-98.)

On November 4, 2004, the South Suburban Council on Alcoholism and Substance Abuse ("SSCA") in East Hazel Crest, Illinois, wrote a letter to the Illinois Department of Human Services on Plaintiff's behalf, reporting that Plaintiff was admitted to the SSCA Women's Residential Program on May 21, 2004, and was transferred to an intensive outpatient program on June 22, 2004.  (Tr. 443.)  The SSCA noted that Plaintiff completed only two out of thirteen sessions in the outpatient program, and then discontinued treatment due to a heavy work schedule.  (*Id.*)  It said that Plaintiff's "prognosis is guarded pending her willingness to follow treatment recommendations."  (*Id.*)

Several years later, Plaintiff moved to Minneapolis to try a treatment program in which her sister had been successful.  (Tr.  943-44.)  Plaintiff entered a treatment program at the Wayside House Treatment Center in St. Louis Park, Minnesota, on March 14, 2007.  (Tr. 905.)  When she arrived she appeared angry, defensive, and guarded.  (Tr. 906.)  This diminished over time.  (*Id.*)

Plaintiff abstained from all mood-altering chemicals while a resident at Wayside. (*Id.*)  Plaintiff completed an MMPI-II test on April 2, 2007, which indicated high levels of anger and depression.  (Tr. 906, 909-10, 914.)  The results were "technically invalid" due to an elevated risk of overly dramatic symptoms presentation, but Plaintiff verified that the profile was an accurate description of how she felt.  (Tr. 909-10.)

Plaintiff completed all of the program goals for graduation from the Wayside House treatment program on June 12, 2007.  (Tr. 908.)  Nevertheless, Amy Noble, Plaintiff's counselor at Wayside, opined that Plaintiff's prognosis was guarded.  (*Id.*)  She noted that Plaintiff was struggling with wanting to use alcohol and wanting to return to family and friends who were using.  (*Id.*)  Ms. Noble further suggested that if Plaintiff returned home, successful recovery would require her to remain in contact with a sober network and continued attendance at recovery meetings.  (*Id.*)

### C.   Medical Records of Mental Health Impairments Before September 11, 2007

Plaintiff underwent several mental-health evaluations, including consultative examinations related to prior social-security-disability applications, before her alleged onset date of September 11, 2007.  The first record is of a psychiatric evaluation with Dr. John Jones on January 30, 2004, which occurred at the request of the Bureau of Disability Determination Services.  (Tr. 328-31.)

Dr. Jones noted Plaintiff was 36-years-old, never married, [4] and unemployed. (Tr. 328.)  Plaintiff reported having depressive symptoms most of her life, which were getting progressively worse.  (*Id.*)  She reported sleeping restlessly for just three to four hours each night.  (*Id.*)  She isolated herself, and her appetite and energy were decreased.  (*Id.*)  She felt sad, irritable, hopeless and helpless.  (*Id.*) She also reported having mood swings and anger problems most of her life.  (*Id.*) She attempted suicide twice in the past.  (*Id.*)  She had problems with concentration and memory.  (*Id.*)  Plaintiff also endorsed paranoid thoughts of being watched and followed, and was suspicious and distrustful of people. (Tr. 329.)  Plaintiff reported having one psychiatric admission to a hospital at age seventeen.  (*Id.*)

At the time of the evaluation, Plaintiff was taking the following medications: Celebrex,[5] Prednisone,[6] Motrin, Butropion,[7] Carbamazepine,[8] and Trazadone.[9]

---

[4]     The record contains inconsistent evidence concerning whether Plaintiff was married.  (*See, e.g.*, Tr. 960 (never married); 743 (married); 959 (married); 956 (married); 825 (never married).)

[5]     Celebrex is indicated for relief from the symptoms of osteoporosis, rheumatoid arthritis in adults, and acute pain in adults.  *Physician's Desk Reference* ("*PDR*") 3097 (Thomson PDR 59th ed. 2005).

[6]     Prednisone is a synthetic glucocorticoid used as an anti-inflammatory and immunosuppressant.  *Encyclopedia and Dictionary of Medicine, Nursing & Allied Health* 1423 (Miller-Keane 7th ed. 2003).

[7]     Butropion is the generic name for Wellbutrin.  Wellbutrin is indicated for the treatment of depression.  *PDR* at 1655-56.

(*Id.*)  Plaintiff reported a history of drug and alcohol abuse between the ages of 17-30, and she had used heroin and cocaine shortly before the evaluation.  (*Id.*)  Plaintiff had last worked as a cook from June 2003 to October 2003, when she was terminated.  (*Id.*)

Plaintiff reported that she lived in a townhouse with a friend who did the grocery shopping, housework, and cooking.  (*Id.*)  Plaintiff maintained her own personal hygiene and did her own laundry.  (*Id.*)  Plaintiff reported that she watched television in her free time, and she maintained contact with her family.  (*Id.*)  Plaintiff has one brother and four sisters.  (Tr. 330.)  Plaintiff also reported a history of childhood emotional and sexual abuse.  (*Id.*)

On mental-status examination, Plaintiff exhibited the following limitations: she recalled none of three objects after five minutes; her mood was depressed; she had auditory hallucinations and paranoia; and her psychomotor activity was tensed.  (Tr. 333-31.)  Dr. Jones diagnosed Plaintiff to have a major depressive disorder, severe with psychotic features; opioid abuse, "on agonist therapy"; cocaine abuse; a history of cannabis abuse; and a history of alcohol abuse.  (Tr. 331.)

---

(Footnote Continued from Previous Page)

[8]      Carbamazepine is the generic name for Tegretol.  Tegretol is indicated for use as an anticonvulsant.  *PDR* at 2378.

[9]      Trazadone is the generic name for Desyrel.  Desyrel is indicated for treatment of depression.  *PDR Drug Guide for Mental Health Professionals* 49 (Thomson PDR 2nd ed. 2004).

A little more than a year later, in March 2005, Dr. John Bailitemp at John Kroger Hospital petitioned the Circuit Court of Cook County, Illinois, to have Plaintiff involuntarily admitted to prevent her from harming herself. (Tr. 448-50.) He stated that Plaintiff was depressed and suicidal. (Tr. 448.) He also indicated that her behavior was unpredictable. (Tr. 450.) There is no other information in the administrative record related to this incident.

On June 23, 2005, a physician from Grand Prairie Services stated that Plaintiff was psychiatrically cleared to enter a substance abuse program. (Tr. 451.) He noted that her diagnoses were mood disorder, NOS (or "not otherwise specified"), and psychosis, NOS. (*Id.*) He indicated that Plaintiff's current medications were Risperdal[10] and Trazadone. (*Id.*) There is no other information about this incident in the administrative record.

Plaintiff was admitted to Jackson Park Hospital in Chicago, Illinois, and placed on suicide watch on October 13, 2005. (Tr. 742-47.) When she arrived in the emergency room, Plaintiff complained of hearing voices and feeling suicidal. (Tr. 746.) She had gone off her mental-health medications because she could not afford them, and she was using cocaine and heroine. (*Id.*) She was having difficulty sleeping at night. (*Id.*) On mental-status examination, she was irritable, inappropriate, angry, illogical, and paranoid. (*Id.*) She was diagnosed with

---

[10] Risperdal is indicated for treatment of schizophrenia, and short-term treatment for acute manic or mixed episodes associated with bipolar disorder. *PDR* at 1743.

"mood disorder secondary to drug induced"; "polysubstance abuse"; "alcohol abuse"; and "rule out major depression recurrent with psychotic features." (Tr. 747.)  She was discharged in stable condition on October 19, 2005. (Tr. 742.)

Plaintiff was admitted to Jackson Park Hospital again on July 24, 2006. (Tr. 604, 722-41.)  She reported that she was diagnosed with bipolar disorder in 2000.  (Tr. 722.)  She was increasingly depressed, felt hopeless, and at times could not control her emotions or her heroin use.  (*Id.*)  She went to the hospital because she felt suicidal.  (*Id.*)  Plaintiff was single but living with her boyfriend of eleven years.  (Tr. 734.)  A drug screen was positive for cocaine and opiates. (Tr. 722.)  Plaintiff was first diagnosed with major depression, but her final diagnoses were; bipolar disorder, mixed state; and heroin dependence.  (Tr. 722-23.)  Plaintiff was discharged on July 28, 2006, and given a prescription for Geodon.[11]  (Tr. 722.)

On April 11, 2007, Plaintiff underwent a diagnostic interview with Social Worker Maggi Larson at Community-University Health Care Center/Variety Children's Clinic ("CUHCC").  (Tr. 960.)  Ms. Larson noted that the Wayside chemical-dependency-treatment program referred Plaintiff for a mental-health evaluation.  (*Id.*)  Ms. Larson noted Plaintiff was in treatment for heroin, cocaine, and alcohol dependence.  (*Id.*)  She also noted that Plaintiff had a mental-health

---

[11]     Geodon is indicated for the treatment of schizophrenia.  *PDR* at 2610.

history of bipolar disorder with violent rages when manic, and suicidal ideation when depressed.  (*Id.*)  She noted that Plaintiff ran over her husband with her car in 2003, but remained married.  (*Id.*)  Further, Ms. Larson noted that Plaintiff had been on several medications, but did not know which medications were helpful because she continued to abuse drugs.  (*Id.*)

On April 25, 2007, Plaintiff underwent a psychiatric evaluation with Clinical Nurse Specialist Anne Murphy at CUHCC.  (Tr. 943-47.)  Nurse Murphy noted that Plaintiff moved to Minnesota from Illinois to get chemical-dependency treatment.  (Tr. 943.)  Plaintiff reported having a terrible temper and a history of mood swings.  (*Id.*)  She also had two hospitalizations for suicidal ideation.  (*Id.*)  Nurse Murphy stated, "[s]he has been diagnosed in the past as bipolar, however, she has had a very significant overlay of chemical abuse for many, many years, so it is very difficult to know to what extent a bipolar diagnosis would be accurate versus a mood disorder, NOS, and impulse disorder."  (*Id.*)  Nurse Murphy noted that Plaintiff's symptoms at the time were irritability with thoughts and imagery of hurting people.  (*Id.*)  She noted that Plaintiff had mild depression, sleep disturbance, no manic symptoms, and no suicidal ideation.  (*Id.*)  Plaintiff was mainly concerned about nightmares of killing someone or being killed, and the thoughts she had about hurting others.  (*Id.*)

Nurse Murphy also noted that Plaintiff had mood swings with overspending, increased libido, increased energy, no sleep, reactivity, irritability, and acting out in anger.  (*Id.*)  She found that these symptoms were hard to

evaluate because they correlated to Plaintiff's chemical abuse. (*Id.*) She noted that Plaintiff had nine prior chemical-dependency treatments. (Tr. 944.)

On mental-status examination, Plaintiff was oriented and did not exhibit thought disorder or pressured speech. (Tr. 945.) Her mood was neutral to irritable and reactive. (*Id.*) Her judgment was adequate, but she was impulsive when irritated. (*Id.*) Nurse Murphy diagnosed Plaintiff with major depressive disorder, rule out intermittent explosive disorder;[12] polysubstance dependency; rule out personality disorder, antisocial type; and she assessed a GAF score of 50.[13] (Tr. 946.) Nurse Murphy recommended Gabapentin[14] for impulse control and Trazadone for insomnia. (*Id.*)

Plaintiff began psychotherapy with Ms. Larson on May 3, 2007. (Tr. 959.) Plaintiff reported being very sleepy during the day while taking Gabapentin. (*Id.*)

---

[12]   The essential feature of intermittent explosive disorder is the occurrence of discrete episodes of failure to resist aggressive impulses that result in serious assaultive acts or destruction of property. *Diagnostic and Statistical Manual of Mental Disorders* 663 (4th ed. Text Revision 2000).

[13]   "[T]he Global Assessment of Functioning Scale [GAF] is used to report 'the clinician's judgment of the individual's overall level of functioning.'" *Hudson ex rel. Jones v. Barnhart*, 345 F.3d 661, 662 n.2 (8th Cir. 2003) (quoting *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. Text Revision 2000) ("DSM-IV-TR")). A GAF score of 31-40 indicates major impairment in several areas of functioning, a score of 41-50 indicates any serious impairment in social, occupational, or school functioning, and a score of 51-60 indicates moderate difficulty in social, occupational, or school functioning. *DSM-IV-TR* at 32.

[14]   Gabapentin is the generic name for Neurontin. Gabapentin is indicated for the management of postherpetic neuralgia in adults, and as adjunctive therapy in the treatment of partial seizures. *PDR* at 2590.

They discussed Plaintiff's ability to handle conflicts without threats or intimidation. (*Id.*)  In another session two weeks later, Plaintiff acknowledged increased irritability, obsessive worry, and craving alcohol.  (Tr. 958.)  Plaintiff was having trouble sleeping due to her worries over finding housing or becoming homeless. (*Id.*)

On May 31, 2007, Plaintiff saw Nurse Murphy again.  (Tr. 940.)  Plaintiff reported she was still having trouble sleeping while on Trazadone.  (*Id.*)  She also reported feeling over reactive and having at least one episode of rage that was hard to control.  (*Id.*)  Nurse Murphy diagnosed mood disorder, NOS, polysubstance dependence, and to rule out intermittent explosive disorder.  (*Id.*) She prescribed Eskalith[15] and Zoloft.[16]  (*Id.*)

On June 5, 2007, Plaintiff was having side effects from medication, and was concerned about combining certain foods with Lithium.  (Tr. 957.)  She had intense alcohol cravings, but maintained sobriety.  (*Id.*)  She applied to begin college in the fall.  (*Id.*)  She reported she had temporary housing at Ascension Place.  (*Id.*)

Plaintiff saw Nurse Murphy again on July 10, 2007, and admitted having a recent relapse, after which she became ill and felt suicidal while in the hospital.

---

[15]    Eskalith is the generic name for Lithium.  Eskalith is indicated in the treatment of manic episodes or manic-depressive illness.  *PDR* at 1485.

[16]    Zoloft is indicated for the treatment of major depressive disorder, obsessive-compulsive disorder, panic disorder, post traumatic stress disorder, premenstrual dysphoric disorder and social anxiety disorder.  *PDR* at 2682-83.

(Tr. 937.)  Plaintiff had discontinued her medications when she relapsed, but she had been sober since her hospitalization on June 28, 2007.  (*Id.*)  Nurse Murphy restarted Plaintiff on her medications.  (*Id.*)  Nine days later, Plaintiff was switched from Zoloft to Prozac due to side effects, although she claimed her mood was fine since stopping Zoloft.  (Tr. 936.)

Plaintiff also reported her recent relapse with drugs and alcohol to Ms. Larson.  (Tr. 956.)  During the relapse, Plaintiff's asthma was exacerbated, and she developed pneumonia.  (*Id.*)  She attempted suicide while hospitalized, but refused admission to a psychiatric facility.  (*Id.*)  During their therapy session, Plaintiff's energy was high, and her speech was logical, rapid, and loud.  (*Id.*)  Eight days later, Plaintiff reported feeling increasingly manic and irritable with others in the group home where she lived.  (Tr. 955.)  Plaintiff reported she had slapped a friend who owed her money, and acknowledged that she intended to hit her with a crow bar, but it got stuck under a car seat.  (*Id.*)  Plaintiff admitted that when her rage escalated, she lost all ability to think about the consequences of her behavior.  (*Id.*)  Plaintiff denied ongoing alcohol cravings.  (*Id.*)

On July 19, 2007, Social Worker Maggi Larson wrote a letter in support of Plaintiff's claim for social-security-disability benefits.  (Tr. 758.)[17]  She noted that Plaintiff was living in a residential program for women with mental-health and chemical-dependency needs.  (*Id.*)  She stated that Plaintiff's diagnoses were

---

[17]    Two sentences in the middle of this letter are illegible.

mood disorder, NOS, and polysubstance dependence.  (*Id.*)  Ms. Larson opined that Plaintiff was "unable to maintain gainful employment due to the mood disorder which causes mood instability and difficulties with impulse control."  (*Id.*)

When she saw Ms. Larson again on August 1, 2007, Plaintiff's mood was manic and her energy was high.  (Tr. 954.)  Plaintiff was lonely and considering returning to her husband.  (*Id.*)  She admitted to having a beer on two separate occasions and was tempted to give up sobriety.  (*Id.*)  Plaintiff agreed to try a support group and to find a sponsor.  (*Id.*)  She was scheduled to attend her college orientation the following day.  (*Id.*)

The next week, Plaintiff was worried about her irritability and impulse control.  (Tr. 953.)  She had violent thoughts about an individual who had smashed her car windows after they argued.  (*Id.*)  She hoped not to act on her thoughts, and agreed to file a police report.  (*Id.*)  Plaintiff admitted she continued to drink a beer once in a while.  (*Id.*)

Plaintiff reported to Nurse Murphy on August 13, 2007, that she had been doing well since starting Prozac.  (Tr. 932.)  She also reported only sleeping two or three hours but not feeling fatigued.  (*Id.*)  However, Plaintiff acknowledged she had been in two violent fights the last two weeks.  (*Id.*)  Nurse Murphy explained that Plaintiff was experiencing a mania, and she prescribed Lithium and discontinued Prozac.  (*Id.*)  Plaintiff also reported she did not take Trazadone because it gave her a "hung over feeling" in the morning.  (*Id.*)  On mental status examination, Plaintiff was alert and oriented with rapid speech, impulsive and

easily angered, and hypomanic.  (*Id.*)  Plaintiff's dosage of Gabapentin was increased.  (*Id.*)

On August 23, 2007, Ms. Larson noted that Plaintiff presented with depression and fatigue.  (Tr. 952.)  Plaintiff acknowledged using alcohol, "meth," and cocaine that day.  (*Id.*)  Ms. Larson reported that Plaintiff's last relapse occurred when she visited her family, and that Plaintiff planned to visit her family again on the weekend.  (*Id.*)  Plaintiff continued to worry about hurting the person who damaged her car.  (*Id.*)

When Plaintiff saw Ms. Larson again on September 6, 2007, she said she was agitated and irritable towards residents and staff in her group home. (Tr. 951.)  She also reported that she had started her college classes, but found them boring and difficult.  (*Id.*)  She acknowledged drinking heavily and using other drugs.  (*Id.*)  Plaintiff also said she was infatuated with a woman from her treatment program.  Although there was a restraining order against Plaintiff due to violence between Plaintiff and the woman's partner, Plaintiff continued to write letters to the woman and engineer encounters with her.  (*Id.*)

### D.    Medical Records of Physical Impairments after September 11, 2007

On October 27, 2007, Plaintiff was treated for asthma at the Hennepin County Medical Center ("HCMC") emergency room.  (Tr. 986.)  She was discharged the same day after her condition improved.  (Tr. 986-87.)  Plaintiff

returned to the HCMC emergency room for treatment of asthma on November 13, 2007. (Tr. 988-90.)

Plaintiff went to HCMC for treatment of hand pain on December 17, 2007. (Tr. 990.) She reported having pain ever since she hit a wall several days earlier, after becoming upset about being charged with driving under the influence of alcohol a few days earlier. (Tr. 991.) She reported feeling depressed and manic. (*Id.*) Plaintiff was making plans to restart day treatment for heroin use. (*Id.*) Plaintiff was diagnosed with a right-hand fracture and given Vicodin for pain control. (Tr. 992, 994, 1001.) During a follow-up visit to HCMC one month after the fracture, HCMC records show that Plaintiff had been noncompliant with the splint she was given, but there was evidence of healing. (Tr. 1007). Plaintiff received a carpal-tunnel brace in hopes of increasing her compliance with treatment, although a splint would be optimal. (Tr. 1007-09.)

On October 15, 2008, Plaintiff saw Dr. Stephanie Sanders at the Park Nicollet Clinic in St. Louis Park, Minnesota, to recheck her right-achilles tendinitis. (Tr. 1130-31.) Plaintiff also reported new right ankle pain. (*Id.*) An MRI did not indicate the etiology of her ankle pain. (Tr. 1127.) Dr. Fernando Pena recommended a bone scan. (*Id.*) In November 2008, Plaintiff had bone scans of both feet. (Tr. 1122.) Plaintiff was diagnosed with right-subtalar-stress phenomenon. (*Id.*) Plaintiff had already unsuccessfully tried using a CAM walker; therefore, Dr. Pena recommended a TriLock Brace. (*Id.*)

### E. Medical Records of Substance Abuse and Mental-Health Treatment after September 11, 2007

On September 20, 2007, Plaintiff reported to Ms. Larson, her social worker, that she was expelled from Ascension Place because she entered the facility intoxicated, so she was staying with various people she knew from her treatment programs. (Tr. 950.) Plaintiff was still having violent thoughts toward the person who damaged her car. (*Id.*) Ms. Larson focused the session on Plaintiff's long term goals, and discussed how, if she returned to her husband in Illinois, her future would involve daily drug seeking. (*Id.*)

In early October 2007, Plaintiff told Ms. Larson she was worried about finding housing. (Tr. 949.) Plaintiff also reported that she would not pass her reading class, so a professor recommended that she withdraw and try again in January. (*Id.*) Plaintiff reported using alcohol infrequently. (*Id.*) A week later, Plaintiff's mood was stable, but she was homeless and staying in a shelter. (Tr. 948.) Plaintiff recognized her difficulty in relationships and said she would avoid relationships until she was more stable. (*Id.*) Plaintiff continued to use alcohol but not drugs. (*Id.*)

Plaintiff saw Clinical Nurse Specialist Kathrin Lund at CUHCC for medication management on October 15, 2007. (Tr. 925.) Plaintiff reported she was asked to leave her sober house for drinking, and was now staying at Harbor Lights Shelter where she had not been drinking. (*Id.*) Plaintiff said she liked beer and was not sure she wanted to stop drinking. (*Id.*) Plaintiff would not restart

Prozac while she was using. (*Id.*) Plaintiff reported depression, but Nurse Lund noted that Plaintiff seemed matter of fact about her life. (*Id.*) Nurse Lund prescribed Lithium, Gabapentin, and Campral.[18] (Tr. 925-26.)

Ms. Larson completed a "Function Report-Adult (Third Party)" Social Security Administration ("SSA") form on Plaintiff's behalf on October 22, 2007. (Tr. 831-38.) She noted that she had seen Plaintiff for seven months, and she saw Plaintiff for one hour, two times a week, for psychotherapy. (Tr. 831.) She indicated that Plaintiff had episodes of mania that prevented her from sleeping. (Tr. 832.) She also indicated that Plaintiff was living in a temporary shelter hotel, and she did housekeeping chores weekly. (Tr. 833.) Ms. Larson noted that Plaintiff liked to be with friends, but she was easily offended, irritable, and could be aggressive and assaultive. (Tr. 835.) She noted that Plaintiff had difficulty getting along with family and with people in authority, and did not tolerate rules or authority. (Tr. 836.) She opined that Plaintiff could probably pay attention for 60 minutes. (*Id.*)

On November 2, 2007, Plaintiff reported to her caseworker, Agnes Otieno, a licensed clinical social worker, that she was still having problems with alcohol. (Tr. 1086.) Ms. Otieno recommended day-treatment services at HCMC. (*Id.*)

---

[18]    Campral is indicated for the maintenance of abstinence from alcohol in patients with alcohol dependence who are abstinent at treatment initiation. *PDR* at 3428.

Ms. Larson referred Plaintiff to social worker John Schipke for "dual diagnosis issues," and Plaintiff met with Mr. Schipke on November 7, 2007. (Tr. 1084.) Mr. Schipke stated, "[s]he introduced me to her dual issues i.e. heroin addiction and bipolar complicated by history of violence. We identified her patterns with mood and use issues and began to plan for breaking out of these patterns." (*Id.*)

Dr. P. E. Shields, a psychologist, completed a Mental Residual Functional Capacity[19] Assessment Form and Psychiatric Review Technique Form ("PRTF") regarding Plaintiff's mental impairments on November 28, 2007. (Tr. 961-978.) Dr. Shields assumed, for the purpose of his assessment, that Plaintiff's polysubstance dependence was in remission. (Tr. 973.) Dr. Shields indicated that Plaintiff was markedly impaired in understanding, remembering, and carrying out detailed instructions. (Tr. 961.) Dr. Shields further concluded Plaintiff had the following mental RFC:

> The claimant retains the capacity to concentrate on, understand, and remember routine, repetitive instructions, but would have marked problems with both detailed and complex instructions. The claimant's ability to carry out tasks with adequate persistence and pace would be moderately impaired, but adequate for routine, repetitive tasks, but not for detailed or complex tasks. The claimant's ability to interact and get along with co-workers would be moderately impaired, but adequate for brief, infrequent, and superficial contact. The claimant's ability to interact with the public would be moderately impaired, but adequate for brief, infrequent and superficial contact. The claimant's ability to accept supervision would not be significantly impaired. The claimant's ability to sustain

---

[19] This Court hereinafter refers to Residual Functional Capacity as "RFC."

an ordinary routine without special supervision is not significantly impaired.  The claimant's ability to handle stress would be moderately impaired, but adequate to tolerate the routine stressors of a routine, repetitive work setting.

(Tr. 963).

On the PRTF, Dr. Shields noted Plaintiff to have an affective disorder under Listing 12.04 and a substance-addiction disorder under Listing 12.09. (Tr. 965.)  He rated the paragraph "B" criteria of the listings as mild restrictions of activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, or pace, and one or two episodes of decompensation, each of extended duration.  (Tr. 975.)

Plaintiff underwent a consultative psychiatric examination with Dr. Alford Karaysuf on November 28, 2007, at the request of the SSA.  (Tr. 979.)  Plaintiff reported having episodes of rage, which caused her to lose many jobs.  (*Id.*)  She also reported that the major aspects of her manic episodes were fast, racing thoughts, and thoughts of harming others.  (Tr. 979-80.)  She was prone to rage when depressed.  (Tr. 980.)  She reported that her mania usually lasted two days, and her depression lasted a week.  (*Id.*)  When depressed, she stayed in bed, sleeping only one or two hours a night.  (*Id.*)  Her appetite, concentration, memory and self-esteem were diminished.  (*Id.*)  She was very anxious, agitated, and restless.  (*Id.*)

Plaintiff had been living at the Exodus Hotel for the previous month. (Tr. 980.)  She did laundry once a week, but many chores were done for the

residents where she was staying.  (*Id.*)  Plaintiff reported that she listened to music all of the time and could not sit still long enough to read.  (*Id.*)  Plaintiff was in a very conflicted relationship with a female partner.  (*Id.*)

On mental-status examination, Plaintiff was oriented, and her immediate recall was fair.  (Tr. 980.)  Her recent and remote memory were intact.  (*Id.*)  She reported vague hallucinatory experiences.  (*Id.*)  She was very mistrustful and her insight was minimal.  (*Id.*)  She was cooperative and showed no psychomotor agitation or retardation.  (*Id.*)  Her tension was mild to moderate, and speech was coherent, rambling, and pressured, with "occasional and no flight of ideas." (Tr. 981.)  Her mood was mildly to moderately depressed.  (*Id.*)  Dr. Karayusuf diagnosed bipolar disorder, mixed; polysubstance dependence, in remission; and antisocial personality traits.  (*Id.*)  He opined that Plaintiff was able to understand, retain and follow simple instructions; was restricted to work with brief, superficial and infrequent interactions with others.  But within those parameters, Plaintiff could, in Dr. Karayusuf's opinon, perform simple, routine, repetitive, concrete, tangible tasks, maintaining pace and persistence.  (*Id.*)

Plaintiff saw Nurse Kathrin Lund for psychiatric medication management on December 20, 2007.  (Tr. 1068.)  Plaintiff reported being more depressed since being jailed for driving while intoxicated and breaking her hand when she punched the jail wall.  (*Id.*)  Plaintiff also discussed the ongoing process of moving into her own apartment.  (*Id.*)  She reported that she had not taken her medications since mid-November.  (*Id.*)  Plaintiff wanted to start another inpatient

treatment program but was not eligible until February.  (*Id.*)  She was restarted on her medications.  (*Id.*)

Plaintiff underwent a diagnostic assessment at Jepson Day Treatment Program ("Jepson") at HCMC on January 9, 2008.  (Tr. 1014-17.)  Plaintiff was referred to the program by staff at CUHCC for substance abuse concerns. (Tr. 1014.)  Plaintiff's goal was to become sober and manage her anger better. (*Id.*)  Plaintiff was noted to be using alcohol heavily again.  (*Id.*)  On mental-status examination, Plaintiff was neatly groomed, dressed appropriately, cooperative, and pleasant but agitated.  (Tr. 1016.)  Plaintiff's speech was rapid and pressured.  (*Id.*)  Her mood was neutral, elevated, and agitated.  (*Id.*)  Her thought process was rapid.  (*Id.*)  Her attention and concentration were fair and her memory intact.  (Tr. 1017.)  Her judgment was fair and insight was poor.  (*Id.*) The other aspects of Plaintiff's mental status were normal.  (Tr. 1016-17.) Plaintiff was diagnosed with the following: bipolar affective disorder; alcohol dependence and opiate dependence in short-term remission; antisocial personality disorder; and she was assessed a GAF score of 40 (indicating major impairment in several areas of functioning).  (Tr. 1017.)

Plaintiff attended only three group sessions at Jepson in January 2008. (Tr. 999-1000.)  In one of the sessions, Plaintiff appeared hypomanic and somewhat unstable.  (Tr. 1006.)  Plaintiff requested discharge from the program after admitting that she was still abusing substances and not ready to change. (Tr. 1000.)  Plaintiff told her caseworker, Ms. Otieno, that the outpatient program

was not helping because she was still drinking.  Plaintiff said that she would go to school instead.  (Tr. 1054.)

On March 4, 2008, Plaintiff left social worker Larson a message at 3:00 a.m. stating she was "losing it" and needed to check herself in somewhere.  (Tr. 1052.)  Plaintiff was encouraged to go to a crisis unit or emergency room.  (*Id.*)  Two weeks later, Plaintiff saw her caseworker and reported that she was drinking alcohol almost daily.  (Tr. 1049.)

On April 1, 2008, Plaintiff requested a referral from her caseworker for inpatient chemical-dependency treatment.  (Tr. 1046.)  Two days later, Plaintiff reported that she could not give up drinking beer, and she again requested a referral for inpatient treatment.  (Tr. 1043.)  At the end of April, Plaintiff saw Ms. Larson and reported that she continued to struggle with irritable mood and alcohol abuse.  (Tr. 1041.)  Plaintiff agreed to complete a chemical-dependency assessment for a referral to an inpatient program.  (*Id.*)

On June 16, 2008, Psychologist J. Konke completed a PRTF for the SSA regarding Plaintiff's mental impairments.  (Tr. 1107-20.)  He opined that Plaintiff had mental impairments of an affective disorder under Listing 12.04, personality disorder under Listing 12.08, and substance-addiction disorder under Listing 12.09.  (Tr. 1107.)  Under the paragraph B criteria, he opined that Plaintiff had mild restriction in activities of daily living, moderate difficulties in maintaining social functioning, marked difficulties in maintaining concentration, persistence, or pace, and no episodes of decompensation since her alleged onset date.

(Tr. 1117.)  Dr. Konke concluded "DAA [drug addiction or alcoholism] is material to this claim."  (Tr. 1119.)  *See* 20 C.F.R. § 1535(a) (noting that the SSA "must determine whether [a claimant's] drug addiction or alcoholism is a contributing factor material to the determination of disability").

The SSA received a letter from Ms. Larson on September 11, 2008. (Tr. 1121.)  Ms. Larson noted that Plaintiff had been her patient since April 2007. (*Id.*)  She indicated that Plaintiff's diagnoses were bipolar affective disorder and polysubstance dependence.  (*Id.*)  Ms. Larson stated:

> [Plaintiff] has a significant history of unstable mood with impulsive and violent behaviors.  Medication intervention has been only marginally effective in stabilizing her moods or addressing her impulsivity.  Her mood remains unstable—during periods of hypomania she does not sleep for a couple of days in a row and during depressive episodes, she has difficulty motivating to leave her apartment.  Her concentration and memory are poor; she has difficulty following directions and her impulsivity and reactivity make it difficult for her to sustain relationships.
>
> It is my recommendation that [Plaintiff] not seek gainful employment at this time.  It is recommended that she comply with mental health and chemical dependency treatment, before rejoining the workforce.

(*Id.*)

## III.     Testimony at the Administrative Hearing

### A.     Plaintiff's Testimony

Plaintiff testified that she obtained her G.E.D. in 1991.  (Tr. 1161.)  She stated that she cannot work because she has mental-health and rage issues where she cannot be around other people.  (*Id.*)  Her medication makes her tired.

(*Id.*)  She is also depressed, and at times is afraid to leave her apartment.  (*Id.*)  She had carpal-tunnel surgery and dropped things in her job as a cook.  (*Id.*)  Her hand issues prevented her from opening certain things.  (*Id.*)  And she said she has an ankle condition that may require surgery.  (Tr. 1161-62.)

Plaintiff testified that she can lift ten or fifteen pounds.  (Tr. 1162.)  She said that she cannot walk or stand for two hours continuously because her ankle condition prevents it.  (Tr. 1162-63.)  And she completed her last chemical dependency treatment in May or June 2007.  (Tr. 1163.)

The ALJ then asked Plaintiff about reported income for self employment in the years 2004 and 2005.  (Tr. 1163-64.)  Plaintiff answered vaguely about someone doing something to "her papers."  (Tr. 1164.)  Plaintiff was living in a building for disabled senior citizens to have access to programs like Meals on Wheels and social services.  (Tr. 1165.)  For accommodations, she had a shower chair and a bathroom railing in her shower.  (*Id.*)

The ALJ asked Plaintiff about her anger issues and past restraining orders, and Plaintiff explained that she gets angry when she thinks people are trying to hurt her or are out to get her.  (*Id.*)  She explained that the restraining orders were the result of threats she made while she was angry.  (*Id.*)

Plaintiff stopped working when she had carpal-tunnel surgery.  (*Id.*)  She believes she needs surgery again on her right hand, but will not have it because she does not think the first surgery helped.  (Tr. 1166).  She missed a lot of work because of her hand and because of depression.  (Tr. 1165.)  At the time of the

hearing, she was sober since February 2007, with one "slip." (*Id.*) She was still, however, having problems with her mental health. (Tr. 1165-66.) She cannot sit still for long due to her anxiety, and she has problems getting along with people. (Tr. 1166.)

## B. Vocational Expert Testimony

Mitch Norman testified at the administrative hearing as a vocational expert. (Tr. 1167.) The ALJ asked Mr. Norman a hypothetical question regarding whether a woman with Plaintiff's age, education, and work background, with impairments of bipolar-affective disease, antisocial-personality disorder, intermittent-explosive disorder, a history of right-carpal-tunnel syndrome, treatment for polysubstance dependence, chronic right-foot pain, and asthma, who was limited to unskilled work with brief and superficial contact with the public, coworkers, and supervisors could perform Plaintiff's past relevant work. (*Id.*) Mr. Norman testified that such a person could perform Plaintiff's past relevant work as a cook. (*Id.*) He also testified there would be other jobs such a hypothetical person could perform including mail clerk and housekeeper. (Tr. 1168.)

The ALJ then asked Mr. Norman whether those jobs would still be available if the hypothetical person's RFC were set at the medium exertional level. (*Id.*) Mr. Norman testified the jobs would still be available. (*Id.*) The ALJ also asked if the jobs would be available if he reduced the RFC to a light exertional level, limiting such a person to lifting up to twenty pounds occasionally,

and ten pounds frequently.  (*Id.*)  Mr. Norman testified the housekeeper position

and the mail-clerk position would still be available.  (*Id.*)  At the sedentary

exertional level,[20] Mr. Norman testified the previous jobs would be precluded, but

such a person could perform the jobs of order clerk and bonding machine

operator.  (Tr. 1169.)

For a final hypothetical question, the ALJ asked Norman what jobs the

person could do if she could not have any contact with coworkers, the public or

supervisors in the workplace, and needed the ability to set her own schedule,

including working less than an eight-hour day.  The hypothetical also assumed

the person would need to be absent three or more times per month.  (*Id.*)  Mr.

Norman testified there were no jobs such a person could perform.  (*Id.*)  He

further testified that if only one of the conditions in the final hypothetical applied,

the person still would not be employable.  (Tr. 1170.)

## IV.    The ALJ's Findings and Decision

On February 17, 2009, the ALJ issued a decision concluding that Plaintiff

was not under a disability as defined by the Social Security Act at any time from

the alleged onset date through the date of the decision, therefore denying

Plaintiff's applications for disability-insurance benefits and supplemental-security

income.  (Tr. 14-26.)  The ALJ followed the five-step procedure as set out in the

---

[20]    The sedentary level would involve occupations in which an individual
would not lift over ten pounds, would only sit for six hours a day, and would not
be required to stand and walk more than two hours in an eight-hour day.  (*Id.*)

Code of Federal Regulations. (Tr. 18-19); *see* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The Eighth Circuit Court of Appeals has summarized these steps as follows: (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant suffers from a severe impairment that "significantly limits the claimant's physical or mental ability to perform basic work activities"; (3) whether the claimant's impairment "meets or equals a presumptively disabling impairment listed in the regulations (if so, the claimant is disabled without regard to age, education, and work experience)"; (4) "whether the claimant has the residual functional capacity to perform his or her past relevant work"; and (5) if the ALJ finds that the claimant is unable to perform his or her past relevant work, then the burden is on the Commissioner "to prove that there are other jobs in the national economy that the claimant can perform." *Fines v. Apfel*, 149 F.3d 893, 894-95 (8th Cir. 1998).

The ALJ found that Plaintiff had not engaged in substantial gainful activity since her alleged onset date of September 11, 2007, therefore meeting the requirement at the first step of the disability-determination procedure. (Tr. 20.) At step two, the ALJ found that Plaintiff had a combination of severe impairments, including affective disorder, antisocial personality disorder, intermittent explosive disorder, and polysubstance dependence. (*Id.*) He also found that Plaintiff's other asserted physical impairments, including carpal-tunnel syndrome, obesity, chronic right-foot pain, asthma and right-achilles tendonitis were not severe impairments because the record did not document significant

treatment for these impairments or indicate that they resulted in functional limitations of twelve-month duration.  (*Id.*)

At step three, the ALJ found that neither Plaintiff's physical or mental impairments met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 20.)  Specifically, the ALJ concluded that Plaintiff did not meet the "paragraph B" criteria for listings 12.04, 12.08, or 12.09, because Plaintiff's mental impairments did not result in at least two "marked" limitations or one "marked" limitation and "repeated" episodes of decompensation.  (*Id.*)  The ALJ found that Plaintiff's mental impairments resulted in only mild restrictions in her activities of daily living, moderate difficulties in social functioning, and marked difficulties in concentration, persistence or pace, and that she had experienced no episodes of decompensation because she did not require any psychiatric hospitalizations. (*Id.*)

The ALJ determined that Plaintiff had the RFC to perform a full range of work at all exertional levels but is unable to maintain competitive work standards when engaging in substance abuse.  (Tr. 21.)

At step four of the disability determination procedure, the ALJ found that Plaintiff could not perform her past relevant work.  (Tr. 21.)  At the fifth step of the procedure, the ALJ found that there are no jobs that exist in significant numbers in the national economy that Plaintiff would be able to perform when her substance abuse disorder is taken into account.  (Tr. 21.)

Then, the ALJ found that if Plaintiff stopped the substance abuse, she would still have a severe impairment or combination of impairments, but the impairments would not meet or equal any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 22.) The ALJ concluded that if Plaintiff stopped the substance abuse, she would have mild restrictions in activities of daily living, moderate difficulties in social functioning, moderate difficulties in concentration, persistence or pace, and no episodes of decompensation. (Tr. 22-23.)

The ALJ determined that if Plaintiff stopped the substance abuse, she would have the RFC to perform a full range of work at all exertional levels, but limited to unskilled work with brief and superficial contact with the public, coworkers, and supervisors. (Tr. 23.) The ALJ found that Plaintiff could take care of her daily needs independently, and had only a mild restriction in activities of daily living. (Tr. 22.) He further found that Plaintiff would have only moderate limitations in social functioning "if the substance abuse was stopped," because she related appropriately to examining and treating sources, used public transportation, and was able to attend support and chemical-dependency groups. (*Id.*) If substance abuse was stopped, the ALJ found Plaintiff would have moderate difficulties in concentration, persistence, or pace. (Tr. 22.) He found this to be consistent with Plaintiff's consultative examination with Dr. Karayusuf, during a period of polysubstance dependence remission, where Plaintiff was fully oriented, immediate digit recall was fair, she recalled three unrelated objects after five minutes, and recent and remote memory were intact. (Tr. 22-23.)

The ALJ found Plaintiff's subjective complaints not fully credible because "when she does not abuse substances and is compliant with medication, the record documents poor motivation on the claimant's part to stop the substance abuse and noncompliance with medications."  (Tr. 24.)  The ALJ noted that Plaintiff did not receive treatment for her hand and ankle pain during the relevant timeframe.  (*Id.*)  He also noted that Plaintiff falsified tax returns for three years (2005-2007) to receive tax refunds.  (*Id.*)  Thus, he found her failure to follow mental-health-treatment recommendations, lack of documentation of physical limitations, and falsification of records to another government agency seriously reduced her credibility.  (*Id.*)

The ALJ also noted that Plaintiff's earnings history since 2003, in the context of significant substance abuse, indicated an overall marginal connection to the workforce.  (*Id.*)  The ALJ gave significant weight to the opinions of Dr. Karayusuf, and the State agency medical consultants.  (Tr. 24-25.)  He gave little weight to social worker Maggi Larson's opinion because she "did not consider the claimant's less severe functional limitations when she maintains sobriety[.]"  (Tr. 25.)

Based on the vocational expert's testimony, the ALJ concluded that if Plaintiff stopped the substance abuse she could perform her past relevant work as a cook.  (*Id.*)  Thus, the ALJ concluded Plaintiff would not be disabled if she stopped the substance abuse, and Plaintiff's substance use disorder was a contributing factor material to the determination of disability.  (Tr. 26.)  Thus,

Plaintiff was not disabled within the meaning of the Social Security Act at any time from the alleged onset date through the date of the decision.  (*Id.*)

## DISCUSSION

### I.    Standard of Review

Congress has prescribed the standards by which Social Security disability benefits may be awarded.  "Disability" under the Social Security Act means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  "An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).

Review by this Court of the Commissioner's decision to deny disability benefits to a claimant is limited to a determination of whether the decision of the Commissioner is supported by substantial evidence on the record as a whole.  42 U.S.C. § 405(g); *Baker v. Barnhart*, 457 F.3d 882, 892 (8th Cir. 2006).  "There is a notable difference between 'substantial evidence' and 'substantial evidence on the record as whole.'"  *Gavin v. Heckler*, 811 F.2d 1195, 1199 (8th Cir. 1987) (quotation omitted).  Substantial evidence is "more than a mere scintilla.  It

means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quotations omitted); *see also Haley v. Massanari*, 258 F.3d 742, 747 (8th Cir. 2001) (quoting *Beckley v. Apfel*, 152 F.3d 1056, 1059 (8th Cir. 1998)). "'Substantial evidence on the record as a whole,' . . . requires a more scrutinizing analysis." *Gavin*, 811 F.2d at 1199. "The substantial evidence test employed in reviewing administrative findings is more than a mere search of the record for evidence supporting the [Commissioner's] findings." *Id.* In reviewing the administrative decision, "'[t]he substantiality of the evidence must take into account whatever in the record fairly detracts from its weight.'" *Id.* (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951)).

In reviewing the record for substantial evidence, the Court may not substitute its own opinion for that of the ALJ. *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993). The Court may not reverse the Commissioner's decision merely because evidence may exist to support the opposite conclusion. *Mitchell v. Shalala*, 25 F.3d 712, 714 (8th Cir. 1994); *see also Woolf*, 3 F.3d at 1213 (concluding that the ALJ's determination must be affirmed, even if substantial evidence would support the opposite finding.) The possibility that the Court could draw two inconsistent conclusions from the same record does not prevent a particular finding from being supported by substantial evidence. *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994).

The claimant bears the burden of proving his or her entitlement to disability insurance benefits under the Social Security Act.  *See* 20 C.F.R. § 404.1512(a); *Young v. Apfel*, 221 F.3d 1065, 1069 n.5 (8th Cir. 2000); *Thomas v. Sullivan*, 928 F.2d 255, 260 (8th Cir. 1991).  Once the claimant has demonstrated that he or she cannot perform past work due to a disability, "the burden shifts to the Commissioner to prove, first that the claimant retains the residual functional capacity to do other kinds of work, and, second that other work exists in substantial numbers in the national economy that the claimant is able to do." *Nevland v. Apfel*, 204 F.3d 853, 857 (8th Cir. 2000).

"Since certain 1996 amendments to the Social Security Act, if alcohol or drug abuse comprises a contributing factor material to the determination of disability, the claimant's application must be denied.  *Brueggemann v. Barnhart*, 348 F.3d 689, 693 (8th Cir. 2003) (citing 42 U.S.C. § 423(d)(2)(C); 20 C.F.R. § 404.1535).  "Under both 20 C.F.R. § 404.1535 (disability) and 20 C.F.R. § 416.935 (supplemental security income), the relevant inquiry is 'whether [the Commissioner] would still find you disabled if you stopped using drugs or alcohol.'"  *Fastner v. Barnhart*, 324 F.3d 981, 984 (8th Cir. 2003) (quoting *Estes v. Barnhart*, 275 F.3d 722, 724-25 (8th Cir. 2002).  It is the Plaintiff's burden to prove substance use disorders are not a contributing factor material to disability. *Id.*

## II.     Analysis of the ALJ's Decision

### A.     The Parties Arguments

Plaintiff raises several arguments relating to the ALJ's consideration of the opinion letter from Ms. Larson, Plaintiff's licensed clinical social worker.  Plaintiff first contends that the ALJ committed legal error by failing to explain in sufficient detail why he gave less weight to Ms. Larson's opinion than to that of Plaintiff's non-treating, examining physicians.  Specifically, Plaintiff argues that the ALJ was required to provide a more detailed explanation of the factors for evaluating the opinions of "other medical sources," pursuant to Social Security Ruling 06-3p, 71 Fed. Reg. 45,593 (Aug. 9, 2006) ("SSR 06-03p").  Plaintiff also argues that the ALJ should have granted greater weight to Larson's opinion based on the length of the treating relationship, evidence supporting Larson's conclusions, and the likelihood that Larson's opinion took into account Plaintiff's periods of sobriety.

Next Plaintiff argues that the ALJ gave insufficient explanation for granting greater weight to Dr. Karayusuf's opinion and to the opinions of other SSA medical consultants.  Plaintiff alleges that the ALJ failed to satisfy 20 C.F.R. § 404.1527(f)(2)(ii), which requires an adjudicator to "explain in the decision the weight given to the opinions of a State agency medical or psychological consultant."  (Doc. No. 13, Pl.'s Mem. in Supp. of Mot. for Summ. J. ("Pl's Mem.") 18.)  Plaintiff also asserts that the ALJ's explanation of the weight given to the SSA medical consultants is insufficient because the ALJ's decision cites to the incorrect exhibits.  (*See id.* at 9.)

Defendant argues that substantial evidence supports the ALJ's finding that substance abuse is a contributing factor material to the determination of Plaintiff's disability. Defendant asserts that the ALJ sufficiently explained the weight given to Ms. Larson's opinion regarding Plaintiff's ability to return to work. Defendant also contends that the evidence from November 2003 through September 2007 is important and probative in the substantial-evidence analysis because Plaintiff was found not to be disabled under the Social Security Act by reason of alcohol and substance abuse being a contributing factor material to the finding of disability one day after her last claim was denied. (*See* Def.'s Mem. 12-13.) And Defendant asserts that the examining SSA consultants' RFC opinions provide substantial evidence supporting the ALJ's decision; these doctors' opinions support the ALJ's decision, Defendant says, because they either assumed Plaintiff's substance abuse was in remission, or took into account Plaintiff's treatment records from her sessions with Ms. Larson from September 2007 through May 2008, thus concluding that chemical dependency contributed to Plaintiff's mental-health issues. (*Id.* at 14-15.)

### B. Whether the ALJ Committed Legal Error by Failing to Discuss All the Relevant Factors under SSR 06-03p

Plaintiff requests that the Court remand this matter because the ALJ committed legal error by failing to discuss the factors identified by the SSA in its policy interpretation ruling SSR 06-03p (*see* Pl.'s Mem. 13), which clarifies how the SSA considers disability opinions provided from "medical sources" who are

not "acceptable medical sources," but "other sources," such as licensed clinical social workers. The SSA considers "medical source" information to come from two categories: "acceptable medical sources" and "other sources." *Sloan v. Astrue*, 499 F.3d 883, 888 (8th Cir. 2007) (citing 20 C.F.R. § 404.1502, 416.902). The former include licensed physicians and licensed psychologists. *Id.* The latter include nurse practitioners, physician assistants, licensed clinical social workers (such as Ms. Larson), naturopaths, chiropractors, audiologists, and therapists.[21] *See id.* Information from other sources "cannot establish the existence of a medically determinable impairment," but it "'may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function.'" *Id.* (quoting SSR 06-03p, 71 Fed. Reg. at 45,594).

Because the Social Security Act does not explain specifically how the SSA will consider evidence from "other sources," such as Ms. Larson, SSR 06-03p provides that the same factors for considering opinions from "acceptable medical sources" can be applied to the opinion evidence from other sources. SSR 06-03p, 71 Fed. Reg. at 45,595. These factors include: (1) the length and frequency of the relationship between the source and the claimant; (2) the consistency of the opinion with other evidence; (3) the degree of support provided for the opinion; (4) the quality of any explanation provided for the opinion; (5) the source's specialization; (6) any other factors that support or detract from the

---

[21] Because they are not relevant here, the Court does not discuss a subset of "other sources" known as "non-medical sources."

opinion.  However, "[n]ot every factor . . . will apply in every case [and] [t]he evaluation of an opinion from an other source depends on the particular facts of the case."  *Id.*

Here, the ALJ's decision to give little weight to Ms. Larson's opinion was not accompanied by an explanation of each of the factors that, per SSR 06-03p, can apply to the consideration of other-source opinions; instead the ALJ explained that Ms. Larson's opinion was devalued because it did not take into account Plaintiff's lesser functional limitations when she maintains sobriety. However, this Court does not consider this explanation an "error of law" requiring remand because the ruling imposes no obligation upon an ALJ to address each and every factor in the determination or decision.  Rather, SSR 06-03p specifically provides that not every factor will apply in every case and clarifies that the adjudicator should provide enough explanation for the claimant and a subsequent reviewer to understand the adjudicator's reasoning.  *Id.* at 45,596 ("Although there is a distinction between what an adjudicator must consider and what the adjudicator must explain in the disability determination or decision, the adjudicator generally should explain the weight given to opinions from these "other sources," or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequence reviewer to follow the adjudicator's reasoning, when such opinion may have an effect on the

outcome of the case."). Accordingly, this Court finds no legal error in the ALJ's omission of an explanation of each relevant factor under the ruling.[22]

The cases Plaintiff cites do not hold that failure to discuss every factor in SSR 06-03p is itself legal error.[23] In *Sloan*, the Eighth Circuit remanded the case to the SSA because the ALJ's summary dismissal of the opinions from "other sources" in the record suggested that the ALJ had failed to assess the relevant factors in SSR 06-03p at all. *See* 499 F.3d at 889-90 ("The SSA must determine whether its new ruling clarifying its assessment of opinions from sources other than those deemed 'acceptable medical sources' affects its prior decision in this matter."). Similarly, in *Halverson v. Astrue*, Civil No. 08-784 (JNE/SRN), 2009 WL 212934, at *13-15 (D. Minn. Jan. 27, 2009), the court remanded the matter back to the SSA, concluding that the ALJ's analysis of "other opinion evidence" suggested that he did not properly consider all of the relevant factors where the ALJ mentioned only one factor from SSR 06-03p, and

---

[22] SSR 06-03p does provide that when an opinion from an "other medical source" is given more weight than an opinion from an "acceptable medical source," "the adjudicator *must* explain the reasons in the notice of decision in hearing cases and in the notice of determination (that is, in the personalized disability notice) at the initial and reconsideration levels, if the determination is less than fully favorable." This requirement, however, is not triggered in this case.

[23] Further, neither *Trimble v. Astrue*, No. 08-3376-CV-GAFSSA, 2009 WL 3247311 (W.D. Mo. Oct. 6, 2009), and *Haman v. Astrue*, Case No. 8:08CV416, 2009 WL 1846825 (D. Neb. June 26, 2009), supports a conclusion that an ALJ commits legal error by failing to discuss every factor listed in SSR 06-03p in his or her decision.

erroneously found that the social worker's opinion was inconsistent with the overall record. And in *Bonnell v. Astrue*, 650 F. Supp. 2d 948, 956, 958-59 (D. Neb. 2009), the district court criticized the ALJ's summary discussion of an "other source" opinion, calling it "clearly inadequate" because the ALJ merely decreed that it was not entitled to weight under SSR 06-03p, but the court did not conclude that mere failure to address each option requires remand. These cases suggest that, in a particular case, an ALJ's abbreviated discussion of some, but not all, of the factors listed in SSR 06-03p may indicate that the ALJ failed to consider the relevant factors, and further explanation of the ALJ's reasoning is required. Because here the ALJ did not discuss all the factors in the SSA's ruling, this Court now turns to whether the ALJ's explanation provides sufficient justification for his decision to give little weight to Ms. Larson's opinion.

**C.     Whether the ALJ's Decision to Give Less Weight to Ms. Larson's Opinion is Adequately Explained**

Plaintiff also contends that the ALJ's decision does not contain sufficient explanation of the SSR 06-03p factors to allow this Court to assess the ALJ's reasoning for giving little weight to Ms. Larson's opinion. (*See* Pl.'s Mem. 12.) Specifically, Plaintiff points out that despite the length of the relationship between Plaintiff and Ms. Larson, the ALJ's decision does not mention that factor, which, Plaintiff argues, suggests the ALJ did not consider all of the relevant factors.

It is true that the length of Ms. Larson's treating relationship with Plaintiff, and the evidence supporting Larson's opinion, are relevant factors in weighing

her opinion, even though a social worker, is not an "acceptable medical source."

*See Sloan*, 499 F.3d at 888-889 (describing how SSR 06-03p instructs adjudicators to consider the length of the treating relationship). Addressing Larson's opinion, the ALJ stated:

> It was the recommendation of Ms. Larson that the claimant not seek gainful employment and comply with mental health and chemical dependency treatment before rejoining the workforce. Ms. Larson's recommendation, which would suggest an inability to work, was based on the claimant's diagnoses and symptoms of a bipolar affective disorder and polysubstance dependence. This assessment did not consider the claimant's less severe functional limitations when she maintains sobriety and, therefore, has not been given significant weight in this decision when assessing the claimant's residual functional capacity when not abusing substances.

(Tr. 25.)

The ALJ thus explained that he devalued Ms. Larson's opinion because it did not assess whether Plaintiff would be disabled if she discontinued alcohol and drug abuse. Larson's opinion is based, in part, on Ms. Larson's diagnosis that Plaintiff suffered from polysubstance dependence, which suggests that Ms. Larson's opinion was that Plaintiff was unable to work because of her chemical-dependency issues. And the treatment records upon which Ms. Larson's opinion is based indicate that Plaintiff was still using alcohol, and less frequently other drugs, between September 11, 2007, and the date of the ALJ's decision. (Tr. 991 (received DUI and looking into restarting treatment for heroin use); Tr. 950 (kicked out of Ascension Place for entering intoxicated); Tr. 948 (continued to use alcohol but not drugs); Tr. 925 (stated she likes beer and not

sure she wants to quit drinking); Tr. 1086 (still having problems with alcohol); Tr. 1084 (therapy for dual diagnoses of heroin addiction and bipolar); Tr. 1068 (more depressed since getting DWI); Tr. 1014 (using alcohol heavily again); Tr. 1000 (admitted she was still abusing substances); Tr. 1052 (drinking alcohol almost daily); Tr. 1046 (could not give up drinking beer.)).  This objective evidence is consistent with the ALJ's conclusion that Ms. Larson's opinion did not take into account how Plaintiff's functional limitations would be affected if she discontinued her alcohol and drug abuse.  Moreover, Ms. Larson's opinion also recommends that Plaintiff comply with chemical-dependency treatment, which further suggests that Ms. Larson's opinion that Plaintiff is unable to work was based, at least in part, on Plaintiff's alcohol and drug abuse.

For these reasons, this Court concludes that the ALJ provided sufficient explanation for this Court to follow his reasoning.

**D.    Whether the ALJ Erred by Providing Incomplete Explanations of the Weight Given to the State Examining Consultants**

Plaintiff's next argument is that the ALJ erred by failing to explain why he granted more weight to the opinions of the SSA's consulting and examining physicians.  (Pl.'s Mem. 18-19.)  Specifically, Plaintiff points out that the ALJ cited to the wrong exhibits in referring to "State agency medical consultants," such that neither Plaintiff nor a reviewing Court can decipher which opinions the ALJ was considering.  (*See id.* at 9.)  Plaintiff requests that this Court remand this matter

to the SSA to require the ALJ to explain why he gave greater weight to such opinions than to Ms. Larson's opinion. (*Id.* at 18.)

The ALJ explained the weight given to these challenged sources as follows:

> In restricting the claimant to the performance of unskilled work involving brief and superficial contact with the public, coworkers, and supervisors the undersigned has given significant weight to the opinion of the State agency medical consultants and Dr. Karayusuf. This residual functional capacity is consistent with the opinions of the State agency medical consultants (Exhibit C-4F) and Dr. Karayusuf (Exhibit C-8F); the claimant's moderate limitations in social functioning and concentration, persistence, or pace have been considered; and it is well supported by the weight of the evidence of record

(Tr. 24-25.)

This Court concludes that the ALJ's citation to the incorrect exhibits in the record does not require remand here for the following reasons. The ALJ's citation to Exhibit C-4F appears to be a typographical error because this exhibit is not an opinion from a consulting physician, but rather includes a series of medical records for the period of April through August 2007. The discussion quoted above appears in the portion of the ALJ's decision where he considered the extent of Plaintiff's functional limitations if she ceased substance abuse. In light of the context in which the ALJ made these findings, the record suggests that the ALJ likely intended to refer to the Mental RFC Assessment and Psychiatric Review Technique completed by Dr. Shields in November 2007 (Tr. 961-78, Exhibits C-6F and C-7F), and Dr. Konke in June 2008 (Tr. 1107-

1120, Exhibit C-7F).  Other than Dr. Karayusuf, Dr. Shields is the only physician

who reviewed Plaintiff's Mental RFC under the assumption that Plaintiff's

"polysubstance dependence [was] in remission."  (Tr. 973.) [24]  And, Dr. Konke's

opinion, though it includes more restrictive assessment Plaintiff's functional

limitations, indicates that Plaintiff's drug and alcohol abuse is material to those

limitations.  (*See* Tr. 1117 (including the handwritten notation that the "Degree of

Limitation" section is considered "w/DAA material").)

Comparing the ALJ's assessment of these sources' opinions with his

criticism of Ms. Larson's opinion, the obvious inference to be drawn is that the

ALJ gave little weight to Ms. Larson's opinion because she did not separate the

symptoms of substance abuse from the symptoms of Plaintiff's other mental

impairments, while the opinions of Drs. Karayusuf and Shields did.  As noted

above, these doctors are the only medical sources who opined on what Plaintiff's

RFC would be if she stopped abusing drugs and alcohol.  The ALJ specifically

noted Plaintiff's consultative examination with Dr. Karayusuf was during a period

of polysubstance-dependence remission.  (Tr. 22-23 (citing Exhibit C-8F, Dr.

Karayusuf's consultative examination report, Tr. 979-981.))  The ALJ's reference

to these sources indicates that he was considering objective medical evidence in

evaluating whether Plaintiff would remain disabled apart from her alcohol and

---

[24]    The only other candidate for the ALJ's reference to a "State agency
medical consultant" from the relevant time period is Dr. Konke, but his
assessment did not consider the contributing effect Plaintiff's substance abuse
would have on her mental RFC.  (*See* Tr. 1107-20.)

drug abuse.  *See Vester v. Barnhart*, 416 F.3d 886, 891 (8th Cir. 2005)
(concluding that where the ALJ followed the analytical framework and made
detailed findings about mental-health diagnoses and alcoholism, the ALJ
untangled alcoholism and mental illness with sufficient clarity to support finding
the claimant was not disabled due to the contributing factor of alcoholism).

Additionally, several of Plaintiff's treatment records suggest that her mental
impairments may be caused, or at least exacerbated, by her substance abuse.
For example, in April 2007, before the relevant time period, Nurse Murphy stated,
"[Plaintiff] has been diagnosed in the past as bipolar, however, she has a very
significant overlay of chemical abuse for many, many years, so it is very difficult
to know to what extent a bipolar disorder would be accurate versus a mood
disorder, NOS and impulse disorder."  (Tr. 943.)  Similarly, in October 2005,
Plaintiff was diagnosed with "mood disorder secondary to drug-induced."
(Tr. 747).  Ms. Larson also referred Plaintiff to Social Worker John Schipke for
"dual diagnosis issues."  (Tr. 1084.)  Following that referral, Schipke stated,
"[Plaintiff] introduced me to her dual issues i.e. heroin addiction and bipolar
complicated by history of violence.  We identified her patterns with mood and use
issues and began to plan for breaking out of these patterns."  (Tr. 1084).

Several of these records are from the adjudicated period preceding
Plaintiff's current application and relating to her prior application.  The ALJ's
conclusions about the materiality of Plaintiff's alcohol and drug abuse that are
appealed here are substantially supported by the fact that one day prior to the

alleged onset date in Plaintiff's current application, a disinterested tribunal found that if Plaintiff ceased abusing drugs and alcohol she would not be disabled. Where a disability claim relates to an unadjudicated period beginning shortly after an adjudicated period, a finding from the adjudicated period is "such an important and probative fact as to render [a] subsequent finding to the contrary unsupported by substantial evidence." *Albright v. Comm'r of Soc. Sec. Admin.*, 174 F.3d 473, 477-78 (4th Cir. 1999). In evaluating the ALJ's decision in this matter, this Court does not lose sight of this highly probative and important fact. *See Lively v. Sec. of Health and Human Servs.*, 820 F.2d 1391, 1392 (4th Cir. 1987) (stating it was inconceivable that the claimant's physical condition had so improved in the two weeks between the original denial of an earlier benefits claim and the alleged onset date of his subsequent appeal that he became capable a more exertionally demanding level of work in such a short period of time).

Given that Plaintiff's prior application was denied because she would not have been disabled if she discontinued drug and alcohol abuse, and the fact that the only medical opinions in the record relating to the current application that addressed the issue whether she would still be disabled if she discontinued such abuse indicate that she would not, this Court concludes that the ALJ properly weighed the medical opinions in this matter, and substantial evidence supports the ALJ's findings.

## RECOMMENDATION

Based on the foregoing, and all the files, records, and proceedings herein,

**IT IS HEREBY RECOMMENDED** that:

1.      Plaintiff's Motion for Summary Judgment (Doc. No. 12), be **DENIED**;

2.      Defendant's Motion for Summary Judgment (Doc. No. 15), be

**GRANTED**.


Date: July 8, 2010

*s/ Jeffrey J. Keyes*
JEFFREY J. KEYES
United States Magistrate Judge

Under D. Minn. LR 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **July 22, 2010**, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections. Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals. A party may respond to the objecting party's brief within **fourteen days** after service thereof. A judge shall make a de novo determination of those portions to which objection is made. This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable to the Court of Appeals.